Joe Freddie **FLEMING**, Petitioner–
Appellant,

v.

**James A. COLLINS, Director, Texas De-
partment of Criminal Justice, Institu-
tional Division, Respondent–Appellee.**

No. 88–1334.

United States Court of Appeals,
Fifth Circuit.

March 6, 1992.

Joe Freddie Fleming, pro se.

S. Michael Bozarth, Asst. Atty. Gen., Jim
Mattox, Atty. Gen., Austin, Tex., for re-
spondent-appellee.

Before CLARK, Chief Judge,[1] BROWN,
POLITZ, KING, WILLIAMS, GARWOOD,
JOLLY, HIGGINBOTHAM, DAVIS,
JONES, SMITH, DUHÉ, WIENER,
BARKSDALE and EMILIO M. GARZA,
Circuit Judges.[2]

EDITH H. JONES, Circuit Judge:

We voted this state habeas corpus case
*en banc* to explore the reach of the public
safety exception to *Miranda's*[3] prophylac-
tic rules protecting fifth amendment rights.
*New York v. Quarles*, 467 U.S. 649, 104
S.Ct. 2626, 81 L.Ed.2d 550 (1984). Dis-
agreeing with the panel majority, we apply
the public safety exception in this case and
affirm the district court's denial of Flem-
ing's petition for writ of habeas corpus.[4]

## I. FACTS

On February 20, 1979, three men, includ-
ing Fleming, entered the Buckner State
Bank in Dallas, armed with pistols, appar-
ently intending to rob it. Their attempt
was foiled by the heroic efforts of security
guard Hubert Hider who, after being pistol
whipped about the head, managed to knock
a gun out of the hand of one of the felons

---

**1.** This opinion was concurred in by Chief Judge
Clark prior to his resignation from the Court on
January 15, 1992.

**2.** Judge Harold R. DeMoss, Jr. was sworn in
after this case was argued to the En Banc Court
and elected not to participate in this en banc
decision.

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.
1602, 16 L.Ed.2d 694 (1966).

**4.** Fleming raised two other alleged grounds for
habeas relief in his original brief on appeal.
The panel did not consider those issues. The en
banc court herewith remands those non-en
bancworthy issues to the panel for final resolu-
tion of Fleming's case.

and retrieve his own weapon. Shots were fired at Hider. As the assailants fled the bank, Hider shot Fleming, but Fleming continued running toward a used car dealership a block away.

Don Adams was working at the dealership when Fleming crossed the front of his lot. Adams heard a gunshot, saw that it seemed to have hit Fleming, and saw the bank security guards in a commotion. When Fleming refused to stop at Adams's command and kept on going into the median of the road, looking for a safe retreat, Adams followed. He jumped into his wrecker truck, where a loaded pistol was stored, and cut Fleming off in a nearby field. Adams, standing beside the wrecker and brandishing his pistol, pinned Fleming kneeling on the ground.

This dramatic frieze riveted the attention of Dallas police officers Jan Montgomery and Valerie Dentherio as they were driving toward the bank in response to its silent alarm, triggered a few minutes earlier. They never reached the bank and did not then know whether the alarm had gone off in error.

What followed can best be described by Officer Montgomery's testimony at the suppression hearing.[5]

### DIRECT EXAMINATION

BY MS. LUDWICK:

Q: State your name, please.

A: Jan Montgomery.

Q: Ms. Montgomery, I notice that you're wearing a uniform of the Dallas Police Department. How long have you been with the Dallas Police Department?

A: Nine years in August.

Q: Were you on duty around 1:15 in the afternoon on February the 20th of 1979?

A: Yes, ma'am, I was.

Q: About that time, did you receive a call to go to a silent alarm location?

A: Yes, ma'am, I did.

Q: And what location was that?

A: The Buckner State Bank at 3600 North Buckner.

Q: Did you have a partner with you, or were you alone in your squad car?

A: I had a partner.

Q: When you got to the Buckner State Bank to answer your call, did you notice anything unusual going on there?

A: I never made the bank.

Q: Did something unusual stop you before you got to the Buckner State Bank?

A: Yes, ma'am.

Q: What would that have been?

A: In the 3500 block of North Buckner, there were two men in a field, and one of them had a pistol in his hand, and the other one was bent over on the ground on his knees.

Q: Okay. Did you and your partner approach the two men in the field?

A: Yes, ma'am, we did.

Q: At that time, did you have any conversation with either of the men?

A: With both of the men.

Q: Okay. Did you have your pistol drawn?

A: Yes, ma'am, we did.

Q: Okay, and did you order the man who was standing there with a gun pointed at the one on the ground to drop his gun?

A: Yes, we did.

Q: Did you later determine that that was a witness and not a bank robber?

A: Yes, we did.

Q: Did you later determine the bank robber was the one who was on the ground?

A: Yes, ma'am, we did.

Q: About how long did it take you to figure that out?

A: About two to three minutes.

Q: And when you finally figured out that the bank robber was the man on

---

**5.** The panel opinion excerpts Montgomery's trial testimony, which is consistent with the above-quoted testimony.

the ground, did you place him under arrest?

A: Yes, we did.

Q: At the time that the man was on the ground and you had the drop, so to speak, on the guy in front of the wrecker as well as the bank robber, did the man on the ground say anything?

A: Yes, he did.

Q: What did he say?

A: He said, "I'm shot. I'm shot."

Q: Okay. Did you tell him to do anything?

A: Yes. I told him to put his hands up in the air. I couldn't tell whether he was armed. I didn't know who he was. And so I told him to put his hands up, and he said, "I can't. I'm shot. I'm shot."

Q: Okay. Did you check that out a little further?

A: Yes, ma'am. He finally raised or attempted to raise his left arm and I did search him down for weapons and determined that he did have a hole—I could see the hole in his jacket just above his elbow. He had been shot.

Q: After you instructed him to put his hands up, did you say anything else to him?

A: I asked him, "Who shot you?" because I didn't know if it was the man holding the gun. I didn't know who he was or anything and he said, "The man at the bank."

Q: He said that the man at the bank had shot him?

A: Yes.

Q: Did you ask him anything else?

A: I asked him several questions. I said, "Who was with you?" And he said, "I was alone," and I asked him his name and he told me, "Johnny Ray Powers" was the name he gave us.

Q: Okay.

A: I asked him, "Where is the gun?" and he said, "I dropped it." And he said, "I didn't get any money," and that was the first couple of minutes conversation—

MR. BERG: I object to the leading, Your Honor.

Q: (By Ms. Ludwick) Did he say anything about whether or not anybody had been shot or shots had been fired at the bank?

A: Yes. He said, "I did not shoot him," referring to the guard.

Q: Okay. Did all this occur within, say, three minutes of the time that you arrived on the scene and placed him under arrest?

A: In three minutes from the time we got the call. We were thirty seconds from the call when we came up on the men in the field.

Q: So it all happened incredibly fast?

A: Yes.

Q: At the time that you were talking to the man shot, you didn't know if he was a bank robber or the bank robber was the guy with the gun or what?

A: I didn't even know if they were connected to the bank robbery.

Q: Until he told you that he had been shot by the guard at the bank?

A: Right.

On cross-examination, Officer Montgomery acknowledged that she did not give Fleming *Miranda* warnings until after she determined that he was connected to the bank robbery. She explained again her reason for questioning Fleming:

I asked him, "Who was with you?" because we didn't know if there was more people involved and I didn't want to get shot in the back, and we were close to a row of buildings about a half a block from the bank, and I didn't know if there was more of them running around loose or what, and I asked him, "Who was with you?" and he said, "I was alone," and then I asked him his name.

She acknowledged that Fleming was not free to leave from the time she arrived on the scene because "I didn't know if he [Fleming] was a victim or what and I don't let anybody get away until I figure out whether they are a victim of a crime or an actor in it." Based on the foregoing testimony, the state trial court admitted Flem-

ing's incriminating statements as part of the *res gestae.*

At trial, Don Adams testified that two female police officers approached him and his quarry with guns drawn, told him to drop his gun and frisked Fleming. He continued:

Q: How far away were you from this police officer, from Fleming and the other lady police officer?

A: Well, at first I wasn't far from him when I had him on the ground, but when they drove up, they drove up pretty fast and they kind of separated the two of us and I kind of backed off a little bit and then she told me to drop my gun and I did and held my hands up and I told her that I was not with him, but anyway, she made me back up again.

Q: The dark-headed lady police officer?

A: Right. I was as far from here— twenty foot, I guess.

Q: Did you show her your identification or identify yourself to her?

A: Yes, I did. I didn't touch myself. I just told her who I was.

Q: Okay. You didn't get arrested out there, did you?

A: I was afraid I was going to get killed.

Q: Do you recall about how long you were out there in the field before you left to go somewhere else with the two lady police officers and Fleming?

A: Goodness, I don't know. There was so many people around—time was at a loss.

Officer Montgomery later confirmed that Fleming's gun was never found. In her trial testimony, she said that the situation was very confusing.

## II. DISCUSSION

*Miranda* warnings were designed to protect an individual's fifth amendment rights during custodial interrogation by law enforcement officers. They advise a suspect of his rights to remain silent and to have an attorney and that any incriminating statement may be used against him. That Fleming was "in custody" here and that at least some of Officer Montgomery's questions could be described as interrogation are not contested.[6]

The Supreme Court has recognized, however, that certain narrow, exigent situations demand an exception to the otherwise rigorously enforced *Miranda* requirements.[7] The exigency was dubbed the "public safety exception" and was approved in *New York v. Quarles, supra.* The Court's rationale, analogous to the justification for an exigent circumstances exception to the fourth amendment warrant requirement, *Quarles,* 467 U.S. 654 n. 3, 104 S.Ct. 2630 n. 3, is simple and compelling:

We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

The facts of *Quarles* exemplify its holding. Informed by a woman that she had

---

**6.** Some cases have dissected the colloquy between a suspect and the police, concluding that identification-type questions are not "interrogation" under *Miranda, United States v. Edwards,* 885 F.2d 377, 384–86 (7th Cir.1989), nor are questions intended to "clarify" a "puzzling decla-

ration," *Andersen v. Thieret,* 903 F.2d 526, 531–32 (7th Cir.1990) (citing cases). No such arguments were made before us.

**7.** *See, e.g., Minnick v. Mississippi,* — U.S. —, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).

just been raped and her assailant, carrying a gun, had entered a nearby supermarket, the police officers gave pursuit. Inside the store, one of them saw Quarles, who matched the victim's description. When Quarles ran, the officer chased him toward the back of the store with pistol drawn. The officer ordered Quarles to stop and put his hands over his head, frisked and handcuffed him and, finding an empty holster, asked where Quarles had put his gun. Quarles nodded toward the place he had hidden a loaded gun and said, "the gun is over there." As a result of the Supreme Court's decision, this statement was allowed in evidence at Quarles' trial.

The Court did not believe that a public safety exception to *Miranda* would interfere significantly with the clarity of that prophylactic decision. Indeed, the majority stated "that the exception which we recognize today lessens the necessity of that on-the-scene balancing process." The Court added:

> The exception will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it. We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect.

*Quarles, id.*

The facts in this case are, if anything, even more compelling than those in *Quarles* itself. Officer Montgomery confronted a still-volatile situation as she questioned Fleming. She did not know whether he, or the man who had drawn a gun on him, was the victim or perpetrator of an offense. When Fleming said he had been shot by "the man at the bank," Montgomery still had reason to fear for her and her companion's safety. She still did not know exactly who had been involved in the disturbance at the bank, and "she didn't want to get shot in the back." As she said, it was a confusing situation. Adams, realizing this, thought the police officers were going to kill him. By contrast, Quarles,

had been fully subdued and handcuffed before the officer asked where he had thrown his gun. Moreover, just as *Quarles* rested on the necessity for the officers to determine where a loaded gun had been discarded, in order to prevent its falling into the wrong hands, so Officer Montgomery had the right to inquire whether, and if so, where, Fleming had dropped his gun. *See United States v. De Santis*, 870 F.2d 536, 538–39 (9th Cir.1989); *United States v. Edwards*, 885 F.2d 377, 384 (7th Cir.1989); *United States v. Brady*, 819 F.2d 884, 887–89 (9th Cir.1987).

The panel majority's hindsight parsing of testimony concerning events that spanned less than five minutes cannot be squared with the intent of *Quarles*. First, a cold trial record cannot convey the anxiety inherent in this armed confrontation. Shots had already been fired and a man wounded. Guns were drawn. For all the officers knew, other guns than Adams's might be pointing at them. It is proper to require police not to use excessive force amid such tension, for to do so saves life and limb. *See, e.g., Tennessee v. Garner*, 471 U.S. 1, 9–10, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985). For the same reason, it is not proper under such circumstances to attempt to require adherence to the strictures of *Miranda* warnings. The warnings could have caused a fatal delay in the officers' understanding of the confrontation. Under only slightly different facts, the utterance of *Miranda* warnings could have deterred Fleming from answering questions that were necessary to protect the officers or bystanders. The cost of importing *Miranda* into this situation, as the Court said in *Quarles*, "would have been something more than merely the failure to obtain evidence useful in convicting [the defendant]. [The] Officer needed an answer to his question not simply to make his case ... but to insure that further danger to the public did not result from the concealment of the gun in a public area." 467 U.S. at 658, 104 S.Ct. at 2632. *See also United States v. Padilla*, 819 F.2d 952, 960–61 (10th Cir. 1987) ("The detective needed a response to his questions, not to obtain evidence against Mr. Padilla, but to prevent further

injury to anyone inside the house or to the officers outside.")

Second, as *Quarles* held, the public safety exception should be virtually intuitively comprehensible to police officers. When the danger inherent in a confrontation has passed, so has the basis for the exception. Thus, in *Quarles*, after the officer had retrieved the loaded gun, he administered *Miranda* warnings. So in this case, Officer Montgomery gave the *Miranda* warnings after Fleming said—although disingenuously—that he acted alone. The panel majority's approach, by requiring minute attention to the details of questioning during an armed confrontation, is confusing not only to law officers but to the courts that must try to apply the majority's analysis. *Quarles*, quite sensibly, compels the opposite conclusion.[8]

We hold that *Quarles* entitled the police to neutralize this dangerous confrontation before *Miranda* took hold. The district court properly applied the public safety exception. Its judgment is to this extent AFFIRMED.

JERRE S. WILLIAMS, Circuit Judge with whom JOHN R. BROWN, Circuit Judge joins, dissenting:

An unarmed man who had been shot twice was on the ground on his knees. A policewoman standing over him pointing a loaded gun at him elicited from him by a specific question an admission, tantamount to a confession, of participation in a nearby bank robbery. The prosecution relied heavily upon this admission in gaining a conviction. This blatant violation of a constitutional right against self-incrimination requires my dissent.

The Court relies upon a recognized exception to the privilege against self-incrimination which authorizes questioning which may lead to admissions or confessions without prior *Miranda* warnings in cases where the public safety is immediately implicated. The public safety exception is a limited exception to *Miranda* recognized by the

United States Supreme Court in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

It is clear that the public safety exception was applicable to the earlier stages of the policewoman's confrontation and questioning of Fleming. The opinion for the Court quotes extensively from the testimony at the suppression hearing, testimony which, of course, was not heard at the trial by the jury. That testimony and the description of the circumstances by the opinion for the Court demonstrate well, and somewhat dramatically, the public safety concerns when the policewoman and her partner, another policewoman, came upon Fleming in a vacant field some distance from the bank. But what this testimony, not admitted in Court, fails to show are the precise and specific questions and answers that led to the constitutional violation that interests in public safety could not justify.

Let the trial testimony speak for itself. This is the specific line of questioning of the policewoman by the prosecutor which was at trial and which the jury heard.

Q: When you first approached him, what was the first thing that you did?

A: I told him to get his hands up and to put his hands up because I didn't know whether he had a gun in his hand. I didn't know what was going on. It was very confusing.

Q: Did he say anything to you when you said, "Get your hands up"?

[Defense counsel objects; overruled]

A: Yes, he did.

Q: What did he say in response to you saying "Get your hands up"?

[Running objection by defense counsel; accepted]

A: He said, "I can't. I'm shot. I'm shot."

Q: Okay. Did you ask him who shot him?

A: Yes, I did.

Q: Did he answer that question?

A: Yes, he did.

---

8. Our research has revealed no federal circuit court case in harmony with the panel majority's

holding here.

Q: What did he say?

A: He said the man at the bank.

Q: Did you ask him, "Where is your gun?"

A: Yes, I did.

Q: Did he answer that question?

A: Yes, he did.

Q: What did he say?

A: He said, "I threw it down."

Q: Did you ask him what his name was?

A: I did.

Q: What did he say his name was?

A: Johnny Ray Powers.

Q: Did you ask him whether or not he had been involved in a robbery of the Buckner State Bank?

A: Yes, I did.

Q: Did he say—

[Defense objections to leading question; overruled]

Q: Tell us whether or not the man who identified himself as Johnny Ray Powers told you he had been involved in the robbery at the Buckner State Bank?

[Objection by defense counsel; overruled]

A: Yes, he did.

Q: After your conversation with Fleming, did you place him under arrest?

A: Yes, I did.

Q: What did you place him under arrest for?

A: For the robbery of the Buckner State Bank.

Prior to this questioning of Fleming by the policewoman, she had already ascertained that the man standing over him with a gun was a citizen who had pursued him from the bank. That citizen had explained his situation and had dropped his gun upon order of the policewoman. That questioning and the first questions asked Fleming were obviously justified under the public safety exception. Until the police knew what the situation was there was every right to explore exactly what the circumstances were that led to the tableau that the two policewomen had come upon. While Fleming objected to all the testimony set out above, it is clear that the line of questioning through the question as to his name and its answer were proper under the public safety exception to *Miranda.*

Some doubt of justification might be raised about the question as to where Fleming's gun was and his response that he had thrown it down. But as long as a gun could possibly be within his reach, there was immediate danger to public safety. Elsewhere in the record, the evidence shows that Fleming also had been subjected to a patdown search for a weapon by the other policewoman before the question, "Where is your gun?"

The clear constitutional invasion of Fleming's rights occurred with the next critical question asking him whether he had been involved in the robbery and the testimony that he replied that he had. It is conceded by all parties that at that time Fleming was under constraint. He was not free to leave. The record also clearly reveals that by this time there was no threat to public safety. The man was on the ground, wounded, and unarmed. This occurred in a vacant field and there were no other persons around except the man who had chased him down and the two policewomen. Without *Miranda* warnings, the police officer with a loaded gun pointed at Fleming asked him if he had participated in a bank robbery and elicited the response that he had.

By admitting this testimony as against proper objection, the court moved far beyond the narrow *Quarles* exception. The exception is clearly recognized, but it is so restricted that it has never been applied in this Circuit before and has rarely even been considered in any case. The prosecutor should never have been allowed to ask the question in court, and the court should never have allowed it and its answer to be admitted. The essence of the privilege against self-incrimination is the prohibition of the use in court of confessions and admissions obtained in this manner. How many thousands of unfortunate persons in totalitarian countries have confessed at the end of the loaded barrel of a gun held by a police officer, whether or not they were guilty? We must not start down that road,

and nothing in *Quarles* or any other decision by the Supreme Court says we must.

The holding that I urge upon this Court must not be mistaken as a holding that "ties the hands of the police." The criticism in this case does not lie as much with the police as with the prosecutor and the state trial court. The police in questioning cannot be expected to hue precise constitutional lines in questioning suspects in circumstances such as these. For example, police often ask questions which call for hearsay and for that reason the answers are not admissible. There are other reasons why police questioning as it occurs in the immediacy of the arrest may transcend the critical boundaries. What is crucial is that the prosecutor and the court must eliminate from the testimony at trial those questions and answers which were asked which transcend constitutional rights.

The Supreme Court itself shortly after the *Quarles* opinion stated its own interpretation of the *Quarles* public safety exception which effectively summarizes and which not only fully supports but compels the verity of my dissenting view in this case. In *Berkemer v. McCarty*, 468 U.S. 420, 491 n. 10, 104 S.Ct. 3138, 3145 n. 10, 82 L.Ed.2d 317 (1984), less than a month after *Quarles*, the Supreme Court stated that the implication of the *Quarles* decision is:

> When the police arrest a suspect under circumstances presenting an imminent danger to the public safety, they may without informing him of his constitutional rights ask questions *essential* to elicit information necessary to neutralize the threat to the public. *Once such information has been obtained, the suspect must be given the standard warnings* (emphasis added).

The threat to the public clearly had been neutralized by the time the admission was elicited at gunpoint. The Supreme Court statement succinctly and with unusual clarity articulates the law which this Court erroneously refuses to apply to this case, and it is the law of *Quarles*.

The only possible issue remaining can be disposed of briefly. The use of this admission or confession cannot be considered harmless error. The opinion for the Court does not rely upon a harmless error claim and properly so. The district court erred in holding otherwise. This record shows beyond any question that the prosecution relied heavily upon this admission in the trial of this case. Other evidence implicating guilt was far from strong and fully persuasive.

In summary, the admission was obtained at gunpoint by a police officer while the unarmed accused was lying on the ground in a vacant field and suffering because he had been shot twice a few minutes before. Any threat to public safety had been resolved. The accused had been given no warning of any kind as to his rights.

This case should be reversed, and the writ of habeas corpus granted. I deeply regret that this Court has upheld this grievous and far reaching constitutional violation of the right of a fair trial untainted by self-incrimination.