**Mark YOUNG, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 92–CF–1025, 94–CO–1072.**

District of Columbia Court of Appeals.

Argued Dec. 19, 1995.

Decided Feb. 8, 1996.

Sandra Levick, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Judson Lobdell, Assistant United States Attorney, with whom Eric H. Holder, Jr.,

United States Attorney, and John R. Fisher and Patricia M. Haynes, Assistant United States Attorneys, were on the brief, for appellee.

Before FERREN, FARRELL and RUIZ, Associate Judges.

FARRELL, Associate Judge:

A gun, a gun magazine, and ammunition were seized from a room in which appellant had been subdued and arrested shortly before. He argues that the evidence should have been suppressed on Fourth Amendment grounds. We hold that the search and seizure were a valid incident of appellant's arrest on conceded probable cause, and we affirm.

## I.

Appellant was charged with armed robbery, possession of a firearm during a crime of violence, and carrying a pistol without a license. He moved to suppress the handgun, magazine, and ammunition seized at the time of his arrest. At the suppression hearing the government adduced the following testimony.

Dareyll Webb was robbed in the stairway of 2841 Robinson Place in Southeast Washington, D.C., by two men. At approximately 6:30 p.m. that day, as Webb was parking his car, he saw appellant Young and Garry Gathers sitting on a nearby fence. Young walked past Webb, said "what's up dude," and entered 2841 Robinson Place in front of Webb; Gathers followed Webb into the building.

Young pulled out a pistol and Gathers produced a revolver. Gathers struck Webb on the back of the head with his gun, and Webb fell to his knees. Young and Gathers pointed their guns at Webb and told him to "[g]ive it up," then took from Webb a gold chain, a bracelet, a watch, two rings, between $300 and $350 in cash, a pager and a Reebok jacket. When an apartment door opened during the robbery, Young and Gathers pulled Webb under a staircase and struck him two more times with their guns, then backed out of the building.

Webb immediately ran up to his friend Tremaine Washington's third-floor apartment and exclaimed that he had been robbed. Everyone in the apartment went to the window, including Webb and a woman named Jean Jeffries. From the window Webb and Jeffries saw Young and Gathers walk across a parking lot and enter 2845 Robinson Place. Young was carrying the Reebok jacket stolen from Webb. Jeffries called 911 to report the robbery, and several officers responded. She described the robbers to them and directed the police to 2845 Robinson Place. Officers Huxoll and Martin went to apartment 304, which Jeffries had identified as the unit where Young and his sister lived. Officer Huxoll knocked on the door and identified himself as a police officer. When there was no response, the tenant in the next-door apartment allowed the officers to wait in her unit with the door slightly ajar.

After some 45 minutes, the officers saw three men leave apartment 304 and enter the hallway. When the two officers appeared from the adjacent apartment, the three began to flee. Officer Martin pursued Gathers who had jumped down a flight of stairs and run out of the building. Young and the other individual, Dewayne Bell, retreated into apartment 304. Young pushed Officer Huxoll and attempted to shut the door, but Huxoll lodged his foot in the doorway, pushed open the door and followed the suspects into the apartment. As he did so he heard something drop behind the door where Young was standing. By forcing open the door, Huxoll had wedged Young between the opened door and the wall. He ordered Bell to get down on the floor, then brought Young out from behind the door and directed him to lie down. Huxoll stood over Young and Bell with his gun drawn and radioed for assistance. Officers Robinson, Morris and Queen arrived within a minute. While Huxoll and Robinson did a "protective sweep" of the apartment to see if there were other occupants, Officer Morris handcuffed Young and Bell with their hands behind their backs as they lay on the floor on their stomachs.

Remembering the dropping noise he had heard on entering the apartment, Huxoll retrieved a plastic shopping bag from behind the door. He felt the bag and what he perceived to be a gun magazine inside; he

opened the bag and found an unloaded .45–caliber gun magazine and a box of ammunition. As Officer Robinson returned to the living room area after checking the kitchen for other persons, he heard "a bump" from behind the stereo, a sound he described as "a knock or a drop." He shined his flashlight behind the stereo and found a gun. When defense counsel asked "if the bump might have just been [the gun] having been caught up in the wires and falling to the ground," Robinson replied "it could have been." According to Robinson, Young's shoulder was "[m]aybe two feet from the stereo" at the time the gun was found. Robinson found the gun three to four minutes after his entry on the scene.

## II.

The trial judge concluded that the police had probable cause to enter the apartment in hot pursuit, a conclusion not challenged on appeal. Regarding the seizure of the gun, magazine and ammunition, the judge found that at the time they were seized these items "were less than ten feet from the defendant's [Young's] head and it [was] likely that the gun behind the stereo was in fact much closer than ten feet." The judge credited Officer Huxoll's testimony that he had heard something drop behind the door on entering the apartment, and Officer Robinson's testimony that he had heard a "bump" behind the stereo as from a falling object. Citing decisions of this court, the judge sustained the search on the ground of "exigent circumstances" and declined to decide whether it could be upheld as a valid search incident to arrest. Still, as relevant to both doctrines, he found it "of critical importance" that "[t]his search was extremely limited in its scope and I think appropriately linked to the justification for the initiation of the search and not exceeding it." In particular, "the evidence does not reveal that the police were going through drawers, looking under beds, looking in closets, opening doors, looking behind drapes, doing anything that one would characterize as searching the apartment."

Based upon "the general reasonableness and limited scope of what the police did here in an armed robbery [investigation]," the judge denied the motion to suppress.

## III.

While conceding that the police had probable cause to arrest him (and properly entered the apartment in hot pursuit), appellant argues that the warrantless search resulting in the seizure of the gun, gun magazine and ammunition violated his Fourth Amendment rights.[1] We hold, to the contrary, that the search and seizure were a valid incident to appellant's arrest. We therefore do not consider the ground of "exigent circumstances" relied on by the trial judge, or the "plain view" theory advanced by the government for the first time on appeal. We may affirm on any basis argued to the trial court when no additional factfinding is necessary. See *Alston v. United States,* 518 A.2d 439, 440 n. 2 (D.C.1986). That is particularly so since we hold that the ultimate question whether the police exceeded the scope of a proper search incident to arrest is a mixed one of law and fact that we decide independently. See *United States v. Johnson,* 18 F.3d 293, 294 (5th Cir.1994); *United States v. McConney,* 728 F.2d 1195, 1206–07 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Cf. *Thompson v. Keohane,* —— U.S. ——, ——, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995) (question whether defendant was "in custody," calling for application of controlling legal standard to historical facts, "qualif[ies] for independent review").

When the police make a valid arrest, "[t]here is ample justification ... for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). "The potential dangers

---

1. Appellant also does not challenge the validity of the initial protective sweep of the apartment. See *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). The government, for its part, concedes appellant's standing to challenge the search of the apartment resulting in the seizures.

lurking in all custodial arrests make warrantless searches of items within the 'immediate control' area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved." *United States v. Chadwick*, 433 U.S. 1, 14–15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977) (citation omitted). The area of "immediate control" under *Chimel* is thus a radius which courts determine objectively on the facts of each case. *See Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723–24, 56 L.Ed.2d 168 (1978) (citing *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)).

■ The parties dispute whether the area of immediate control is measured as of the time the suspect is initially detained—as the government argues—or as of the time the search is conducted. We adopt as appropriate to a search occurring in the privacy of a home, as this one did, the two-part standard employed by the United States Court of Appeals for the Ninth Circuit in *United States v. Turner*, 926 F.2d 883 (9th Cir.), *cert. denied*, 502 U.S. 830, 112 S.Ct. 103, 116 L.Ed.2d 73 (1991). There the court, in turn borrowing "a two-level inquiry" from the United States Court of Appeals for the Seventh Circuit,[2] explained that a court must first "put itself in the officers' position and determine[ ] whether the [seized object] was within the arrestee's immediate control when he was arrested." *Id.* at 887. The court must then "consider[ ] whether events occurring after the arrest but before the search made the search unreasonable." *Id.*[3]

■ Appellant does not seriously dispute that at the time he was seized and ordered to lie on the floor, he was within reach of both the gun magazine and ammunition (which he had just dropped at his feet) and the gun. The fact that he was initially pinned behind the door did not lessen the danger that he could break free and lunge for a weapon the police had ample reason to believe he had brought into the apartment with him. Appellant focuses instead chiefly on the ensuing events, namely the fact that before the officers searched the bag or found the gun he and Bell both lay on the floor with their hands cuffed behind their backs and at least three officers hovering over them or nearby. He argues that at this point, the weapons were beyond his effective control. We agree with those courts, however, that have held that the precautions of immobilizing and handcuffing defendants before searching the area do not spoil a valid search incident to arrest in circumstances of the kind presented here.

Those circumstances, in sum, are the close spatial and temporal scope of the search conducted and the strong reason the police had to believe that guns were nearby. In *Turner, supra*, when the police entered Turner's apartment with a warrant for his arrest, they found him in bed with a woman and with a .45–caliber revolver beside him under the sheets. They handcuffed him and took him into another room, then searched the room where he had been arrested and found a rifle, ammunition and cocaine. Rejecting the argument that handcuffing and removing him to another room ended the justification for a *Chimel* search, the court explained that the police "had already discovered a concealed weapon beneath the bedding" and "did not take [Turner] far away or delay for long before conducting the search." 926 F.2d at 888. The court agreed with the Seventh Circuit in *Fleming, supra* note 2, that in considering post-arrest precautions "it does not make sense to prescribe a constitutional test that is entirely at odds with safe and sensible police procedures." *Id.* (quoting *Fleming*, 677 F.2d at 607).

---

**2.** *United States v. Fleming*, 677 F.2d 602, 607 (7th Cir.1982).

**3.** In *Fleming, supra* note 2, the Seventh Circuit noted that the second "stage of the inquiry is rendered unnecessary, in cases where the arrestees are occupants of a car, by [the] rule [of *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981)]." 677 F.2d at 607 n. 14.

Although we need not consider this question, *Belton* leaves little doubt that *Fleming*'s observation is correct. *See Belton*, 453 U.S. at 461 n. 5, 101 S.Ct. at 2864 n. 5 (rejecting court of appeals' theory that because the defendant or the items searched for had been reduced to the officers' "exclusive control" following the arrest, a search could no longer be validly incident to the arrest).

Likewise, in *Fleming*, the defendants Fleming and Roulenc had been arrested inside and just outside a house, respectively, on probable cause to believe they were trafficking in cocaine. A bag Roulenc was carrying was not searched until five minutes later after police reinforcements had arrived and Roulenc "had been disarmed, taken to the street, and handcuffed." 677 F.2d at 606. The court of appeals rejected the argument that these measures "defeased [sic] [the police'] right to search under *Chimel* principles," *id.* at 607–08: "handcuffing Roulenc and having reinforcements enter Fleming's house should not be determinative, unless we intend to use the Fourth Amendment to impose on police a requirement that the search be absolutely contemporaneous with the arrest, no matter what the peril to themselves or to bystanders." *Id.* at 607. *See also United States v. Parra*, 2 F.3d 1058, 1066–67 (10th Cir.1993) (where police had just found a loaded weapon within defendant's reach, an "on-the-spot decision" to conduct a second search in the same area after defendant had been handcuffed was not unreasonable, even though "hindsight suggests that [defendant] had little chance of reaching" into that area); *United States v. Lucas*, 898 F.2d 606, 607–08 (8th Cir.1990); *United States v. Silva*, 745 F.2d 840, 847 (4th Cir.1984), *cert. denied*, 470 U.S. 1031, 105 S.Ct. 1404, 84 L.Ed.2d 791 (1985).

■ Appellant argues that the police' own testimony at the suppression hearing that (after the initial protective sweep) they were looking for items stolen in the robbery shows they no longer feared the defendants could gain access to weapons. Officer Robinson in fact testified that the officers were looking for "some of the stuff that ... had been taken" *and* "evidence, such as a gun," since they knew neither of the two guns purportedly used had been recovered. In any case, we evaluate a search incident to arrest "under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved." *Scott, supra*, 436 U.S. at 138, 98 S.Ct. at 1723. "Since it is the fact of custodial arrest which gives rise to the authority to search, it is of no moment that [the officer] did not indicate any subjective fear of the respondent or that

he did not himself suspect that respondent was armed." *Id.* (quoting *Robinson*, 414 U.S. at 236, 94 S.Ct. at 477).

Also answered by *Chimel's* focus on objective reasonableness is appellant's reliance on what he terms the trial judge's "finding" that it did "not seem reasonable that [the defendants] could have gotten access [to a gun] because of the fact that they were handcuffed behind their backs." We defer, of course, to actual findings of fact by the trial judge, but the judge here was applying a legal standard to the facts and, as stated *supra* at 5, we review that conclusion independently. The judge's conclusion was tentative anyway: he questioned the defense's reliance on the gun's location behind a large stereo, stating that "if we had hypothesized that [appellant] is the one that put [the] gun there, [he] knows exactly where it is and it's just a few feet from him"; and he expressly declined to say "that our cases dictate the conclusion that there's not a *Chimel* rationale for this search."

The judge *did* find as a fact that the gun lay behind the stereo only "a few feet from" appellant. A short time earlier, appellant and another had used guns to commit a robbery, and he had shown his determination to avoid arrest by retreating into the apartment and struggling with Officer Huxoll. The police still had to stand him and Bell up to transport them; arrestees have been known to slip handcuffs; and "[p]ersons under stress may attempt actions"—such as lunging for a gun—"which are unlikely to succeed." *McConney*, 728 F.2d at 1207. Because "[c]ustodial arrests are often dangerous," the police "must act decisively and cannot be expected to make punctilious judgments regarding what is within and what is just beyond the arrestee's grasp." *United States v. Lyons*, 227 U.S.App.D.C. 284, 293, 706 F.2d 321, 330 (1983).

■ Consequently, while the presence of armed officers and the use of handcuffs are relevant to determining the scope of a proper search incident to arrest, *see Brooks v. United States*, 367 A.2d 1297, 1304–05 n. 6 (D.C. 1976), these factors do not convince us that the search here was unreasonable. Appel-

lant does not question its contemporaneity. *See Alston v. United States,* 518 A.2d at 446 (search incident must take place "without any indication of undue delay and as part of an uninterrupted immediate custodial process"). The only delay was to await reinforcements and sweep the apartment for other suspects. The area searched, as the trial judge found, was "much closer than ten feet" from appellant, his shoulder resting—according to Officer Robinson's testimony—"[m]aybe two feet from the stereo" concealing the gun. The search was limited, moreover, to the two places where the officers had concrete reason to believe weapons might be: the plastic bag appellant had dropped, and the rear of the stereo where a second noise of an object falling had just been heard. As the trial judge commented, there was no general rummaging through drawers or closets or "anything that one would characterize as searching the apartment." *See Chimel,* 395 U.S. at 763, 89 S.Ct. at 2040. And, as emphasized already, appellant had proven his willingness to use force and resist arrest, and the guns used in the robbery had not been recovered. Indeed, viewed from this perspective, the handcuffing was *consistent* with a reasonable fear that appellant was still a threat to the officers' safety. *Cf. United States v. Johnson,* 16 F.3d 69, 72 & n. 6 (5th Cir.) (noting that defendant was not handcuffed; citing with approval decision of another court "that the *failure* to handcuff defendant and allowing him to walk around the room vitiated any contrived fear that defendant would resist arrest or destroy evidence") (emphasis added), *on reh'g,* 18 F.3d 293 (1994).

We hold, therefore, that, the search of the plastic bag and the area behind the stereo was valid despite the precautions the police had taken by handcuffing appellant and summoning reinforcements. "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *Wilson v. Arkansas,* —— U.S. ——, ——, 115 S.Ct. 1914, 1916, 131 L.Ed.2d 976 (1995) (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985)). In the context of this case, involving an arrest for a violent crime committed a short while before, it would "not make sense"—it would be *un*reasonable—to hold that the "safe and sensible police procedures" employed, *Fleming, supra* note 2, 677 F.2d at 607, aborted the officers' authority to search the immediately surrounding area for weapons and destructible evidence.

*Affirmed.*