Rasheed CROOK, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–1606.

District of Columbia Court of Appeals.

Argued Dec. 18, 2000.
Decided April 12, 2001.

Clarence Powell, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Valinda Jones, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Roy W. McLeese III, and John Brownlee, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, FARRELL and GLICKMAN, Associate Judges.

STEADMAN, Associate Judge:

Police arrested appellant after seeing him holding a gun while in close proximity to a man bleeding from the waist. As appellant was being handcuffed, the officer observed that appellant himself was suffering from a bullet wound. Thus realizing that other armed individuals might be in the vicinity, the officer asked several questions about the cause of the wounds. Appellant incriminated himself in one of his answers.

The only issue in this appeal is whether the trial court erred in denying appellant's motion to suppress the incriminating answer. Appellant asserts that the questioning was not preceded by the warning required by *Miranda*[1] for custodial interrogation. We think the government is correct that the questioning here fell within the "public safety" exception to the *Miranda* requirement. Accordingly, we affirm the judgment.[2]

## I.

■ The suppression hearing consisted of the testimony of Officer Milton Norris, a ten-year veteran, which was fairly summarized in the government's brief as follows.[3] While passing by in a car, Norris observed a man on the sidewalk bleeding from the waist area with a lot of blood on his shirt. He also observed appellant walking several feet in front of that man and trying to conceal a pistol in his left hand. Norris stopped the car and, with the help of another officer in the car, promptly arrested and handcuffed appellant. Norris at that point noticed that appellant himself also had a bleeding hole in his elbow. He

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The continuing validity of this case and its constitutional basis were established by the Supreme Court in its recent holding of *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

2. Appellant was convicted at a jury trial of carrying a pistol without a license and related weapons offenses, based on his possession of the pistol at the time of his arrest.

3. We "view the record in the light most favorable to the party that prevailed in the trial court ... and we must sustain any reasonable inference that the trial judge has drawn from the evidence." *Morris v. United States*, 728 A.2d 1210, 1215 (D.C.1999).

asked appellant whether he had been shot and the appellant said yes. The police immediately sent for an ambulance to take care of both appellant and the man with the bloody shirt.

At that point, Norris "tried to get information from [appellant] and the other guy that was shot so we [could] broadcast a lookout for the other subjects . . . who did the shooting of these two[.]" More specifically, Norris said, "I asked [appellant] who were the guys that shot them and why and where were they." Appellant said, according to Norris:

> [he] and his friend [were] walking down the street and they saw three males, black males, in the street as they walked. As they looked at the males the three males looked at them funny so they looked back at the males. And shortly after that the males produced a[sic] handguns and starting shooting at [appellant] and his friend. And then he told me that he retrieved his gun [4] and shot back.[5]

Appellant and his wounded companion said the incident had "just happened and that the guys were right in the area[,]" and gave a brief description of who had shot them, and where they were. Based on this information, the police on the scene broadcast a lookout and sent officers in search of the suspects.

On cross-examination, Norris expanded on his frame of mind and purpose in the questioning. He explained that he did not write down any of appellant's statements because "I didn't feel that they were . . . statements [with] regards to what we're here for today. My main objective was to ask some questions in regards to the guy—the subject who shot them." He acknowledged that no *Miranda* warnings were given because "I wasn't really concerned with him being placed under arrest at that time." Thus, he did not ask appellant why he had the gun or "anything pertaining to that gun." Instead, "I asked him who shot him. I asked him did he know the guys, why he was shot. And where—where did—where was he shot at, the area where he was shot." At that time, Norris thought appellant was "treated as a victim, not as a criminal."

The trial court credited Norris's testimony. The court found that the questions "appeared to be quintessential investigatory questions not designed to build a case against [appellant] but rather to find out about how the [appellant] had gotten shot[,]" and that the officer's actions were fully consistent with an intent "not to elicit incriminating statements but . . . to investigate and apprehend the people who were responsible for shooting [appellant]." Accordingly, the trial court denied the motion to suppress appellant's statements based on a *Miranda* violation.

## II.

The basic principle of the *Miranda* holding is that before a suspect may be subjected to "custodial interrogation," he must be given the well-known *Miranda* warnings. The government virtually concedes, at least for this appeal, that appellant was in "custody" within the

---

**4.** Subsequently Norris quoted appellant as saying that he "pulled out his weapon and fired back."

**5.** This account was markedly different from appellant's testimony at trial, where he said the shooting had taken place in an apartment building, that his companion had drawn the pistol in defense, that the companion when shot dropped the gun, that appellant had picked up the gun, and he and his companion were fleeing from the attackers when stopped on the street. He denied that he had told the police that the shooting occurred on the street or that he had fired the pistol.

meaning of *Miranda* at the time of Norris's questioning, and we may assume for present purposes that the questioning was "reasonably likely to elicit an incriminating response" and therefore constituted "interrogation" within the meaning of *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Nonetheless, we think that the questioning here falls within the "public safety" exception to the requirement for *Miranda* warnings, since they were directed at dealing with the danger created by the possible presence of other armed and dangerous individuals in the immediate vicinity.[6]

This public safety exception was articulated by the Supreme Court in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In *Quarles*, the police officer, after noticing that the suspect was wearing an empty shoulder holster, immediately asked the suspect where the gun was in order to alleviate the fear of someone else picking up the weapon. *Id.* at 655–58, 104 S.Ct. 2626. The Court noted that the officer "needed an answer to his

question not simply to make his case against [the defendant] but to insure that further danger to the public did not result from the concealment of the gun in a public area." *Id.* As a matter of policy, the Court stated:

> We decline to place officers ... in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

*Id.* at 658–59, 104 S.Ct. 2626. In short, the Court concluded that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for [the] prophylactic rule protecting the Fifth Amendment's privilege against

---

**6.** The parties clash over whether the government sufficiently raised the public safety exception during the suppression hearing, and if not, then what the effect of that failure is. An appellate court can, of course, sustain a trial court ruling on any legitimate basis. *See, e.g., Ibn–Tamas v. United States*, 407 A.2d 626, 635–36 (D.C.1979); *Lewis v. United States*, 594 A.2d 542 (D.C.1991). Nevertheless, appellant contends that because appellee did not mention this exception during the proceedings below, he lost the opportunity to include relevant testimony as a part of the record, thereby precluding this court from making a fair ruling on the issue. At oral argument, however, appellant was unable to explain what testimony he would have elicited from the police officers regarding this exception to the *Miranda* rule that he did not otherwise try to elicit. *Cf. Trice v. United States*, 662 A.2d 891, 895 n. 9 (D.C.1995) (under *Quarles*, officer's subjective intent not determinative to applicability of exception). Moreover, we disagree with appellant's assertion that the gov-

ernment never even alluded to this issue during the suppression hearing. Although its primary argument to the trial court was that there was no interrogation here, the government's stated reasoning behind the questioning—that it was designed to ascertain the threat to the public safety—goes to the very heart of the public safety exception. The mere fact that appellee did not use the words "public safety exception" does not prevent this court from analyzing the issue; nor does it allow us to conclude that appellant made less of an effort to include all that was necessary in the record. Therefore, because "no additional factfinding is necessary" for us to rule on the issue, *see Young v. United States*, 670 A.2d 903, 906 (D.C.1996), and whether the facts establish a violation of *Miranda* is ultimately a question of law to be decided de novo by this court, *see, e.g., United States v. Turner*, 761 A.2d 845, 850 (D.C.2000), we see no reason not to apply the public safety exception to this appeal.

self-incrimination." *Id.* at 657, 104 S.Ct. 2626.

■ After the Supreme Court decided *Quarles,* the Fifth Circuit expounded two significant glosses relevant to the case before us on the application of the public safety exception. *See Fleming v. Collins,* 954 F.2d 1109 (5th Cir.1992). First, when making this assessment, courts should be careful if they are relying solely on the "cold trial record" because it could not fully apprise the courts of the "anxiety inherent in [an] armed confrontation." *Id.* at 1113. The *Fleming* court noted that a "hindsight parsing of testimony concerning events that spanned less than five minutes cannot be squared with the intent of *Quarles.*" *Id.* Second, that court reiterated the notion from *Quarles* that the exception should be intuitively comprehensible to police officers. *Id.* at 1114. It cautioned that "requiring minute attention to the details of questioning during an armed confrontation[ ] is confusing not only to officers but to the courts that must try to apply the ... analysis." *Id.*

■ As noted above, and as is particularly the case when carving out exceptions to the *Miranda* rule, the real concern in these cases is the issue of "guid[ing] police officers, who have limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." *Dunaway v. New York,* 442 U.S. 200, 213–14, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Specifically addressing that fear associated with police officers making on-the-scene decisions, the *Quarles* Court noted:

> The exception will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it. We think police

officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect.

467 U.S. at 658–59, 104 S.Ct. 2626; *see also United States v. Williams,* 181 F.3d 945, 954 n. 13 (8th Cir.1999) (although officer did not specifically refer to weapons or safety concerns in the question posed to the defendant, and despite the fact that the question was broad enough to elicit other information, court allowed the statement and cautioned against conditioning the applicability of the exception on an officer's ability to ask questions in a specific form).

We think these principles squarely apply to the case before us.[7] Norris engaged in the questioning only after being told by appellant that he was shot, and after seeing not one, but two individuals with apparent injuries from bullet wounds. The questions as a whole objectively reflected Norris's stated aim to ascertain and neutralize any threat posed by the other shooters in the altercation. More than a general fear that one person might locate a gun and use it, as was the case in *Quarles,* this case involved the public's safety from several armed people who just shot and wounded two others.

■ Appellant at oral argument as much as conceded that, within the public safety exception, it was quite proper for Norris to ask him who had shot him and where they were. His objection ultimately focuses solely upon the question why and how he was shot. We think this invokes too fine an analysis. As the cases quoted above indicate, it is unwarranted to expose a police officer's immediate questioning in

---

7. We have previously applied the *Quarles* exception in *Trice, supra,* note 6, and in *Ed-* *wards v. United States,* 619 A.2d 33, 36–37 (D.C.1993).

the context of fast-moving and danger-fraught events to such after-the-fact legal parsing. In the circumstances of this case, we are satisfied that the officer's questions and actions fell within the ambit of the public safety exception.

The trial court's order denying appellant's motion to suppress is therefore

*Affirmed.*