Marcus YOUNG, Appellant,

v.

UNITED STATES, Appellee.

No. 07–CM–1227.

District of Columbia Court of Appeals.

Argued June 2, 2009.

Decided Oct. 8, 2009.

Mindy Daniels, for appellant.

Katherine M. Kelly, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III and Matthew M. Graves, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, KRAMER and OBERLY, Associate Judges.

KRAMER, Associate Judge:

Appellant Marcus Young was charged with (1) attempted carrying a pistol without a license (in his home), in violation of D.C.Code § 22–504(a) and § 22–1803 ("attempted CPWL"); (2) attempted possession of an unregistered firearm, in violation of D.C.Code § 7–2502.01(a) and § 22–1803 ("attempted UF"); and (3) attempted unlawful possession of ammunition, in violation of D.C.Code § 7–2506.01(3) and § 22–1803 ("attempted UA").[1] Young entered a conditional guilty plea preserving his right to appeal the denial of his motion to suppress the tangible evidence in this case. He argues on appeal that (a) the trial court erroneously denied his motion to suppress, and (b) the convictions violate his Second Amendment rights under *District of Columbia v. Heller*, —— U.S. ——, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). We affirm.

1. These three charges were originally included in an information that was dismissed without prejudice so that the charges could be consolidated with a separate homicide indictment against appellant. But the three weapons offenses were later removed from a superseding indictment that joined a co-defendant to the homicide case. Thus, the three weapons charges were tried separately. In the homicide case, some of the ammunition evidence at issue in this case was admitted as evidence, and Young was convicted of, *inter alia*, second degree murder while armed.

## I. Facts

The following relevant testimony was presented at the hearing to determine whether the physical evidence in this case should be suppressed.

### A. Government Witnesses

#### 1. Deputy Marshal Wayne Warren

U.S. Marshal Wayne Warren, assigned to the Capitol Area Regional Fugitive Task Force ("Task Force"), testified that he took part in executing an arrest warrant for Young at Young's home. The warrant was based upon Young's failure to appear for a court hearing in a separate CPWL case. When the warrant was executed, Marshal Warren also had information that Young was involved in a homicide, but Marshal Warren used the warrant from the CPWL case, obtained by Detective Stanley Farmer of the Metropolitan Police Department ("MPD"). Detective Farmer asked Marshal Warren to let him know if they found and arrested Young because he was interested in the possibility of getting a search warrant based on the homicide for which Young was being investigated.

Marshal Warren and the other members of the Task Force who were executing the warrant arrived at Young's house, an end-unit town home, between 6:00 a.m. and 7:00 a.m. When the officers approached the front door, they saw that the windows to the left of the front door were open. Through those windows, they saw a man lying down on his stomach on the living room floor with his hands underneath a pillow. An officer knocked on the front door, and the man began to move around. The officers announced that they were the police, commanding the man not to move and to let them see his hands.

One of Young's siblings opened the door from the inside, and Marshal Warren and two others approached the man, appellant Marcus Young, and "[g]ot him up off the floor, cuffed, and off to the side. The rest of the entry team went past [them] and began to do ... a protective sweep through the rest of the residence to make sure nobody else was there."

The man was cooperative and told them his name was Marcus Young. This information, combined with Marshal Warren's recognition of Young based on photographs and physical descriptions, allowed Marshal Warren to confirm his identity.

Meanwhile, one of the officers who conducted the protective sweep called Marshal Warren downstairs into a basement bedroom where the officer had lifted the mattress from the box spring. There was a plastic bag with what appeared to be bullets inside it on top of the box spring. Marshal Warren told the officers to leave them there and that he was going to call Detective Farmer. He then went back upstairs.

However, Marshal Warren testified, because "[w]e got the defendant in custody so fast I wasn't feeling easy about something because [Young] was lying on the floor on a pillow." He asked whether someone had "searched that immediate area where they had taken [Young] into custody, because [they] usually put people on couches and so forth.... [N]obody said they had. So [Marshall Warren] said, well, we need to ... move the pillows and the linens out of the way so [we] make sure there is nothing there [that would endanger] our safety before we sit him on the couch." At this point, "[o]ne of the deputies had pushed away the pillow and in the process of pushing away the pillow where [Young's] head was, there was a ... dark-colored .45 [automatic handgun]."

Marshal Warren also testified that members of the Task Force typically look between box springs and mattresses because

that space is one of the areas in which they commonly locate fugitives or other people and yet it was hard to discern whether someone was there without lifting both the mattresses and box springs. An example, he explained, was one case where "we had somebody that was hiding underneath a mattress, in between the mattress and the box spring, and we had a small child sitting on that bed that we were interviewing, and the fugitive was underneath the mattress."

When challenged on cross-examination as to why it was necessary to lift the mattress, Marshal Warren rejected Young's counsel's assertion that they could "have easily found out if anybody was hiding under the mattress by pushing down on the mattress," explaining that "you have got to understand that this is all happening simultaneously. When we're dealing with who we think was the defendant, they are doing their sweep of the house to make sure nobody else is inside, hiding, not knowing if we actually have him in custody or not." Marshal Warren was unable to recall, however, whether the gun was discovered while Young was still in the house or was already in a police car.

### 2. Special Agent Thomas Barmonde

Special Agent Thomas Barmonde for the Bureau of Alcohol, Tobacco, Firearms and Explosives, testified that he participated in executing the search warrant for Young's arrest. He testified that, although he did not make any notes or records of the incident he did "remember [the arrest] because it was a, kind of a safety issue afterwards, realizing how close the firearm was to [Young] . . . how easy access he had to it. So it did stick in [Agent Barmonde's] mind." It was his recollection that "there was a possibility that the individual we were going to pick up was involved in a shooting. So we were being extra cautious" because "[a]ny time we go out [to execute a warrant] we [are] usually made aware of even if there is a chance that someone might carry firearms or [have] been involved in a shooting."

Agent Barmonde testified that protective sweeps are used because "[a]ny time you are in a location you want to be sure that . . . everyone there is safe. So you will make sure that there [are] no other individuals around, anyone hiding, or any other threat to anybody's immediate safety." Agent Barmonde stated that while conducting protective sweeps, "I have seen people in closets, I have found people in kitchen cabinets, I have found people underneath mattresses, I have seen people in drop ceilings, in attics, in storage lockers, in suitcases." When asked to clarify what he meant by "underneath mattresses," he stated, "I have seen people literally underneath beds; I have seen people underneath mattresses laying between box springs and mattresses before."

When asked on cross-examination whether when "someone is hiding between mattress and box spring, there is going to be some indication in the way the mattress is leaning or some hump on the mattress, or some gap between box spring and mattress," Agent Barmonde replied that "[m]ost times there would, but I have seen times where you . . . could stand there and look at it and have no idea." When asked if in such cases one could "just go over and just press on the mattress and feel somebody underneath that mattress," he stated that he had

> personally been in a situation where there was an individual between a mattress and a box spring and it was such an old box spring, and it had so much [of] . . . the insides not there and springs missing, that I don't think you would have been able to feel someone if you would have put your hand on the

mattress. Or if you would have just stood back and looked. I don't think you would have known that the individual was there.

Accordingly, he stated, "[i]f I'm there and I go into a room, I'm going to lift up a mattress. Absolutely . . . I wouldn't turn my back to that room and walk out before checking underneath a mattress and box spring."

Agent Barmonde could not recall whether Young had been taken out to a police car before the pillow was moved and the gun was found, but he didn't "believe so" because "from what [he could] remember, he was still in that general area . . . because it was [a] pretty short, short time after it was deemed that there was no one else in the house, that [the gun] was discovered."

### 3. Detective Stanley Farmer

Detective Stanley Farmer testified that he told Marshal Warren to contact him if the Task Force apprehended Young because Farmer planned to arrest Young for a murder he was investigating. Upon learning that Young had been apprehended, Farmer went to the home where Young had been arrested and relayed a physical description of the home "back to the detectives in the office so they [could] type up [a] search warrant" for Young's home in connection with the homicide case. The search warrant was to be used to recover the handgun that was used in the homicide, a 9 mm handgun. Farmer requested the search warrant prior to learning of either the gun or the ammunition found in the home by the Task Force.

When Farmer arrived, he saw Young's mother, two brothers, and girlfriend and other agents in the home, one of whom asked whether anyone had looked under the pillow on the living room floor. When the answer was negative, "one of the

agents picked the pillow up and observed a .45 caliber handgun underneath the pillow." Farmer estimated that it took "about 15 minutes" for him to get to the house after being notified that Young had been apprehended, but he did not know how much time had elapsed between Young's apprehension and his notification of that fact. Similarly, Farmer could not remember how much time had elapsed between his arrival and the inquiries regarding the pillow, nor could he recall whether Young was still in the living room at the time the pillow was lifted.

The search warrant Farmer had requested was granted, and the entire house was searched. Farmer did not pick up the gun found under the pillow. Rather, both the gun and the "[a]ssorted ammunition" discovered in the home's basement were photographed and recovered by the Crime Scene Search unit. The ammunition found was a combination of 9 mm and .45 caliber bullets, but no 9 mm handgun was recovered that day.

### B. Young's Witnesses

#### 1. Taloria Anderson

Young is the father of Taloria Anderson's daughter. Anderson testified that she was lying on the couch in the living room when the U.S. Marshals came in through the front door. They asked Young if he was Marcus Young. When he said yes, they handcuffed him. They then asked him if anybody else was in the house, and he said yes, his mother was upstairs and his brothers were downstairs. At this point, Young's mother came downstairs on her own, while the Marshals went downstairs to get his brothers, whom they questioned in the kitchen. They told Anderson, however, to stay on the couch. At some point after the questioning, the Marshals took Young outside, but Anderson did not know "how long later."

After Young was taken outside, "one man in particular, he came back in the house and he just started searching the house again. And that's when he looked underneath the pillow.... And then he found the gun and ... all the other men, they went outside ... really not doing nothing." There had been no discussion of the gun before it was found, and she did not see anything else that the officers obtained through their search. The MPD arrived after the gun was found.

Anderson admitted that she cares for Young and that she would rather he were free "to tuck [their] daughter in," but denied that those feelings would keep her from telling the truth on the stand or that she was unclear on any of her testimony.

### 2.  Aaron Young

Aaron Young, appellant's younger brother, testified that he was in the basement when the Marshals arrived at the house "early in the morning," around 7 a.m. but before 8 a.m., and that he knew that the Marshals had arrived because he heard them call out "police, or Marshals, or whatever." He then heard Young say, "I'm right here," at which point Aaron was "kind of thinking [he] was dreaming" and "didn't know what was going on because [he was] kind of asleep." Then the police came downstairs and woke him, shining flashlights in his face. They told him to get dressed and come with them.

Aaron was in the first of two bedrooms in the basement when the Marshals found him. There were two sets of mattresses in the room, only one of which Aaron used to sleep on. The Marshals asked him if anyone else was present, and he told them about his older brother Michael, who was sleeping in the back bedroom. Some of the officers then headed to the back bedroom while Aaron, now dressed, was escorted upstairs by two of the officers.

When he arrived upstairs, Aaron saw Young in handcuffs, heading out the front door. The Marshals put him in the living room with Anderson. Two officers then came upstairs with Michael in handcuffs. At this point all five people (Aaron, his mother, Anderson, Michael, and Young) were sitting in the living room. Both Michael and Young were handcuffed.

When the gun was found, Young was in the living room, but Aaron was not sure if he was "on that spot, or ... on the couch." Then, Young was led out of the living room, and an officer went downstairs for approximately 15 minutes. When the officer came back up, he ordered everyone into the kitchen.

Aaron did not see the police search anywhere or lift or overturn any mattresses. But while they were sitting in the kitchen, one of the officers asked Aaron "to come downstairs to take a look at something," at which point they went downstairs into the first bedroom. The bed on which Aaron had been sleeping was untouched, but the other mattress in the room "was like turned and the clothes were like, knocked over." Aaron could not remember exactly what the officer asked him, but it was "something about" a gun, and the officer showed him bullets in a plastic bag. The officer said the bag was found underneath the mattress, but Aaron did not see them find the bullets. This was the first time anyone had mentioned bullets.

### C.  Trial Court's Findings

After hearing closing arguments, the trial court concluded that the government had met its burden of proof by a preponderance of the evidence that recovery of the gun and the ammunition did not violate Young's Fourth Amendment rights because the gun was found as part of a lawful search incident to arrest and because the

ammunition was found as part of a protective sweep.

Crediting portions of the testimony from all of the witnesses, the trial court found that the Task Force officers went to Young's house with an arrest warrant for a man who was "suspected of being dangerous and unpredictable and a threat to the community" and that "it certainly was reasonable that the police would want to look under the pillow where the defendant's head had been resting" because there were other people in the home at the time of Young's arrest, and *United States v. Harris*, 629 A.2d 481 (D.C.1993) provided that, *inter alia*, arresting officers "could do a protective sweep of the premises to protect against the danger of an attack, from either the defendant or others, [such as] any type of accomplice." Moreover, the court found that "everything happened rather quickly" and that it was reasonable to move the mattresses in light of police testimony that "in prior experiences . . . individuals hide in all kinds of spaces, including mattresses."

Similarly, the trial court found that the gun was found as part of a search incident to lawful arrest because "everything happened rather quickly," Young was in the living room when the gun was found, the officers "were still concerned about placing people on the couch because they were in such close proximity to the pillow and no one had really addressed the issue of the pillow," and, "under those circumstances, the search of the pillow would certainly have been a search of an area in the immediate vicinity of where they saw the defendant lying when they came on to the premises." Accordingly, the court concluded, that area was one "within [Young's] immediate control" when he was arrested.

A few days later, Young agreed to enter a conditional guilty plea on all three of the charges, reserving for appeal the "[trial court's] ruling with regard to his motion to suppress."

## II. Motion to Suppress

Young argues that we should reverse the trial court's denial of his motion to suppress the physical evidence against him because (a) the seizure of the gun was not part of a search incident to a lawful arrest, and (b) neither the seizure of the gun nor of the ammunition was part of a proper protective sweep. We affirm.

■ "In reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Prince v. United States*, 825 A.2d 928, 931 (D.C.2003) (quoting *Peay v. United States*, 597 A.2d 1318, 1320 (D.C.1991) (en banc)). "In particular, [w]e must 'give deference to the court's findings of fact as to the circumstances surrounding the appellant's encounter with the police' and uphold them unless they are clearly erroneous." *Id.* (quoting *Hill v. United States*, 627 A.2d 975, 979 n. 7 (D.C.1993)). "However, we review *de novo* the trial court's legal conclusions." *Id.* (citing *Gomez v. United States*, 597 A.2d 884, 889 (D.C.1991)).

### A. The Gun

■ Young argues that the search that revealed the gun was not properly a search incident to a lawful arrest because he was outside at the time and the gun was not in his immediate control when it was found. As noted above, however, the trial court credited testimony establishing that Young was still inside the home and near the pillow when the gun was found and that the gun was found only a short time after Young was arrested. Those factual conclusions have basis in the record and are not clearly erroneous. Therefore,

we defer to those factual findings. *Prince, supra,* 825 A.2d at 931.

█ Based on those findings, the trial court's legal conclusions with respect to the gun were also correct. In the course of arresting a suspect, law enforcement officers may search the area within the suspect's immediate control to prevent the suspect from grabbing a weapon or evidence. *Harris, supra,* 629 A.2d at 492 (citing *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)). The court must first "put itself in the officers' position and determine whether [1] the seized object was within the arrestee's immediate control when he was arrested," and then "[2] consider whether the events occurring after the arrest but before the search made the search unreasonable." *(Mark) Young v. United States,* 670 A.2d 903, 907 (D.C.1996) (citations and alterations omitted).

██ The mere fact that a suspect is handcuffed at the time the search is undertaken does not render the search illegal. *Id.* at 908–09 (affirming the trial court's decision not to suppress evidence of a gun found in a search that took place shortly after the appellant was handcuffed because (1) the subsequent search was delayed only "to await reinforcements and sweep the apartment for other suspects," (2) the area searched was "much closer than ten feet" from the appellant, and (3) the search was limited to two places where the officers had concrete reason to believe weapons might be). Indeed, in cases where a suspect had committed a violent crime "a short while before, it would 'not make sense'—it would be unreasonable—to hold that the 'safe and sensible police procedures' employed [handcuffing the suspect] aborted the officers' authority to search the immediately surrounding area for weapons and destructible evidence." *Id.* at 909 (citations omitted) (affirming the trial court's determination that police did not violate the appellant's Fourth Amendment rights where the appellant, a fleeing armed robbery suspect, was handcuffed and lying on the ground while two officers conducted a general protective sweep, during which time the capturing officer searched an area only a few feet from where the suspect was apprehended and found a gun). Thus, "[n]o flat rule exists that a search must be conducted, if at all, on the exact spot and at the precise moment where a suspect is first apprehended." *Alston v. United States,* 518 A.2d 439, 444 (D.C.1986).

Here, taking the "facts and all reasonable inferences therefrom ... in favor of sustaining the trial court ruling," *Prince, supra,* 825 A.2d at 931, the pillow was very close to Young at the time of his arrest, since he had his head on, and his hands under, the pillow when the police arrived, and the pillow was lifted shortly after Young's arrest. Moreover, it is undisputed that Young was also a murder suspect at the time of his arrest, and the arresting officers were aware of this fact when they apprehended him. Thus, the first prong of the two-part inquiry (wherein the court "put[s] itself in the officers' position and determines whether the seized object was within the arrestee's immediate control when he was arrested") is met. Likewise, as in *(Mark) Young,* the mere fact that Young had been handcuffed does not amount to an "event[ ] occurring after the arrest but before the search [that] made the search unreasonable." Accordingly, it was not unreasonable for the police to search under the pillow, and we affirm the trial court's determination that the recovery of the gun did not violate Young's Fourth Amendment rights.

### B. The Ammunition

█ Young argues that the protective sweep did not legally extend to either the

bedrooms or to the space between the mattresses and the box springs because Young had told the officers about all of the people in the home and there was no report of gunfire or other exigent circumstances warranting a search of those areas. We disagree.

As noted above, the trial court credited testimony that the Task Force officers went to Young's house with an arrest warrant for him knowing that he was "suspected of being dangerous and unpredictable and a threat to the community" and that all of the events at issue "happened rather quickly." These factual conclusions have basis in the record and are not clearly erroneous. Therefore, we will defer to those factual findings. *Prince, supra,* 825 A.2d at 931.

■ A protective sweep is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (cited in *Harris, supra,* 629 A.2d at 493). Two kinds of protective sweeps are reasonable and lawful under the Fourth Amendment. *Harris, supra,* 629 A.2d at 493 (citing *Buie, supra,* 494 U.S. at 334, 110 S.Ct. 1093). First, police may "as an incident to [an] arrest . . ., as a precautionary matter and *without probable cause or reasonable suspicion,* look in closets and other spaces *immediately adjoining* the place of arrest from which an attack could be immediately launched." *Id.* (citing *Buie, supra,* 494 U.S. at 334, 110 S.Ct. 1093) (emphasis added). Second, "police may undertake a *broader search of the home, i.e.,* beyond immediately adjoining spaces, when they are aware of 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.' " *Id.* (citing *Buie, supra,* 494 U.S. at 334, 110 S.Ct. 1093) (emphasis added). Thus, protective sweeps of areas beyond those immediately adjoining the place of arrest require at least reasonable suspicion, while protective sweeps limited to areas immediately adjoining the place of arrest do not.

Here, taking the "facts and all reasonable inferences therefrom . . . in favor of sustaining the trial court ruling" *Prince, supra,* 825 A.2d at 931, the court correctly found that the officers had reasonable suspicion to conduct the "broader"-type protective sweep that revealed the ammunition. First, the officers knew that Young was a murder suspect and that his arrest warrant for failure to appear was based on a separate CPWL case. Second, Young had not yet been positively identified as the man they were looking for at the time the protective sweep commenced. Thus, considering the early hour, the nature of Young's criminal charges, and the fact that Young had not yet been identified as being the man they were looking for, a reasonably prudent officer would be warranted in believing that there may have been people in the basement and that they may have "pos[ed] a danger to those on the arrest scene." Moreover, the trial court found that the protective sweep and Young's apprehension and identification took place in a very short period of time. Given that, at the time they began the protective sweep, the police could not be certain that they had apprehended Young, it was not unreasonable for the officers to look for people in the basement.[2]

2. Anderson testified that Young told the officers that his brothers were in the basement bedrooms while his mother was upstairs.

The trial court did not specifically credit this portion of Anderson's testimony; however, even assuming that Anderson was correct that

Having established that the officers had reasonable suspicion to look for people in the basement bedrooms, in light of the officers' experience with finding people hidden in odd places, including between mattresses and box springs, it was also reasonable for them to look between the mattresses and box springs when trying to find and secure all people in the basement sleeping areas. Accordingly, we affirm the trial court's determination that the recovery of the ammunition did not violate Young's Fourth Amendment rights.

### III. Second Amendment

■■■■■ Young argues that, in light of *District of Columbia v. Heller, supra,* the trial court's refusal to dismiss the information in this case violated his Second Amendment rights. While an issue can be preserved for review where a defendant's guilty plea is conditional, *see generally Casey v. United States,* 788 A.2d 155, 157–58 (D.C.2002), only the issue or issues specifically reserved will be considered appealable. *Id.* Because Young did not reserve the Second Amendment issue he raised below when entering his conditional guilty plea, that issue is not preserved for our review and therefore we decline to address his claim of error on that ground.

For the foregoing reasons, the judgment of the trial court is

*Affirmed.*

Young told the officers that his brothers were downstairs and his mother was upstairs, our conclusion is the same. Even if Young was the first person found, he told the truth when he identified the other occupants of the house, and those occupants turned out to be generally cooperative, a reasonably prudent officer nonetheless would still be warranted in believing that there may have been a hidden "individual posing a danger to those on the arrest scene" on the facts of this case because the officers did not have that knowledge at the time the protective sweep was being conducted.