*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CM-0433

DEVON GREENFIELD, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2022-CMD-007141)

(Hon. Deborah J. Israel, Trial Judge)

(Argued October 16, 2024                              Decided April 10, 2025)

*Richard P. Goldberg* for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb* and *Elizabeth H. Danello*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, DEAHL, and SHANKER, *Associate Judges*.

DEAHL, *Associate Judge*: Police officers saw three men hanging out after dark in a public park that had been the subject of complaints about PCP use and sale. The officers parked their car, exited, and approached the individuals on foot. As they approached, appellant Devon Greenfield broke off from the group and walked away.

The officers chased him down, running by his two companions on a small footbridge where they detected the distinctive smell of PCP in the area, and as they caught up to Greenfield at the edge of the park, the smell of PCP intensified. They told him he was being stopped and asked him why he was walking away from them.

Greenfield responded that he was just drinking a beer, and when officers pressed to look inside the backpack he had on him, Greenfield opened it up and showed them a half-empty bottle of Fireball whiskey and a tall boy of Natural Ice. The officers noticed that the smell of PCP intensified further when Greenfield opened his bag, and asked why they could smell PCP coming from Greenfield's bag. When he professed ignorance, they placed him under arrest and took the bag away from him. One officer searched the bag as the other two placed Greenfield in handcuffs. The searching officer found a small zippered case in the bag's side pocket, and inside of that case he found three vials of what appeared to be liquid PCP. Greenfield was charged with possession of an open container of alcohol (POCA) and attempted possession of PCP. He moved to suppress the PCP vials and the alcohol containers as the byproducts of illegal searches. The trial court denied that motion and after a bench trial, convicted him as charged.

Greenfield now appeals his convictions. He argues that (1) the trial court erred in denying his motion to suppress, (2) there was insufficient evidence to prove

that he had the intent to possess the PCP found in his bag, and (3) the trial court erred when it allowed the government to introduce the glass vials as part of its rebuttal case even though Greenfield did not present any defense case. We disagree with Greenfield on each point and affirm his convictions.

## I. Facts

The relevant facts are not in dispute, and the events surrounding Greenfield's arrest were captured on body-worn camera footage that was admitted at trial.

Three police officers were on patrol early one December evening—it was around 5:30 pm and dark out—when they spotted a group of men gathered on a footbridge in a public park. The officers were aware of complaints of "PCP use and sale" after dark in that particular park, testifying generically that they had received "numerous calls for the use of PCP and the sale of PCP" after sunset in that park, without specifying how recent or numerous those reports were. So the officers parked their car and approached the men. Greenfield abruptly "separated from the group" and "began to walk away," prompting the officers to chase after him. As the officers reached the footbridge where Greenfield's two companions (who appeared to be drinking alcoholic beverages) remained, one of the officers said "that was PCP." At trial Officer Carter Moore testified that he "could smell the odor of PCP in the air" as they chased Greenfield, explaining that he recognized the smell from

his police training and experience in more than fifty PCP cases. Moore testified that the odor of PCP grew stronger the closer he got to Greenfield.

The officers caught up to Greenfield, who slowed down as the officers approached, and told Greenfield that he was "being stopped." They asked him if there was "any reason that you were just walking away from over there?" Greenfield replied, "Yeah, I was drinking a beer." Moore then asked whether Greenfield had any guns in his backpack, initiating the following exchange:

> Moore: You don't got no guns in your bag or nothing?
> Greenfield: Nah.
> Moore: You mind if I see?
> Greenfield: I ain't got no guns.
> Moore: You mind if I see in your bag and make sure there ain't no gun there?
> Greenfield: I ain't got no guns, just beer.
> Moore: Just beer?
> Greenfield: Yeah.
> Moore: No PCP?
> Greenfield: Nah, just drinking a beer, man.

At that point, Greenfield took his backpack off, unzipped it, and pulled out a half-empty bottle of Fireball whiskey and a tall boy of Natural Ice beer. Moore testified that he then "smell[ed] a very, very strong odor of PCP from the book bag," "greater" than when officers merely approached Greenfield. Moore asked Greenfield why he could smell PCP coming from his bag, and Greenfield again replied that he "was just drinking a beer." Moore then took the bag from Greenfield

and told him to put his hands behind his back, and the two other officers began to restrain Greenfield as they attempted to handcuff him.

Moore placed the bag at Greenfield's feet and began to search it as his colleagues repeatedly told Greenfield to "stop flexing" and to "put [his] hands behind [his] back," as they seemed to be having some difficulty handcuffing him. Moore opened the bag's side pocket and removed a small zippered case he found inside of it, unzipped the case, and immediately identified three glass vials of PCP inside of it. At roughly the same time the other officers completed the process of handcuffing Greenfield. At trial, Moore was presented with an evidence bag containing the three glass vials he recovered, and he testified that he believed they contained PCP because he could still smell the distinctive odor of PCP through the seal of the evidence bag. He noted that in his experience, PCP has such a "strong chemical odor" that "[m]ost individuals" "are taken aback" when they smell it for the first time. He further opined that "[t]ypically PCP comes in larger cologne-style bottles" than the vials he found on Greenfield.

Another officer, Scott Brown, who was not involved in Greenfield's arrest, testified about the smell and packaging of PCP. The trial court qualified Brown as an expert witness who could testify to the "appearance" and "odor" of PCP. Brown explained that liquid PCP is generally "packaged for street sales in" glass vials of

various sizes and ranges in color from "light yellowish" to "amber." In some tension with Moore, Brown described the recovered vials as of the type that he typically sees for storing PCP. Brown described the "distinct" "chemical" smell of PCP as a "strong, pungent," and "unique" odor that is instantly recognizable to those who know it, and he opined that one can smell PCP even when it's in a vial because it "seep[s]" out of its container. The government presented Brown the same evidence bag containing the recovered vials, and he testified that based on their odor and appearance, the vials contained PCP.

The government rested its case after Moore and Brown testified. At that point the trial court heard argument on Greenfield's pending suppression motion, which the court did not hold a dedicated hearing on. Defense counsel argued that Greenfield was initially stopped without reasonable articulable suspicion to believe he was engaged in criminal activity so that his seizure was unlawful, and that the contents of his bag should be suppressed as fruits of that unconstitutional seizure. The court denied the motion. It reasoned that officers had reasonable articulable suspicion to believe that Greenfield was engaged in criminal activity given the "strong odor of PCP" in the area, the reports of PCP use in the park after dark, and Greenfield's evasive behavior as police approached. It further found that after he was stopped, Greenfield consented to the search of his bag and its contents when he "voluntarily opened his bag" and pulled out the containers of alcohol. At that point,

the court reasoned, Moore further searched the bag as an incident to Greenfield's lawful arrest.

The defense rested without presenting any evidence or witnesses. The court then expressed uncertainty as to whether the government had ever moved the bag of vials recovered from Greenfield into evidence. Defense counsel correctly recounted that the government had not done so, and the prosecutor said he "believe[d] it was admitted," but in any event, he would alternatively "offer it as a rebuttal exhibit." Defense counsel objected that both the government and defense had already rested, but the trial court nonetheless admitted the exhibit, explaining that the government "get[s] a rebuttal case."

The court found Greenfield guilty of POCA and attempted possession of PCP. Greenfield now appeals his convictions.

## II. Analysis

Greenfield raises three challenges to his convictions on appeal: (1) that the trial court erred when it denied his motion to suppress both the containers of alcohol and the PCP vials found within his bag; (2) that the evidence was insufficient to show that he knew the substance in his possession was PCP; and (3) that the trial

court erred in admitting the vials of PCP as a government rebuttal exhibit.  We now address those three arguments.

**A. The initial seizure, arrest, and searches of Greenfield were lawful.**

"[W]hether the police violated a defendant's rights under the Fourth Amendment is a legal question that we review de novo." *Brown v. United States*, 313 A.3d 555, 560 (D.C. 2024) (quoting *Bingman v. United States*, 267 A.3d 1084, 1087 (D.C. 2022)).  As is typically the case, it is helpful to analyze Greenfield's Fourth Amendment claims intrusion-by-intrusion, asking if officers had sufficient justification for each search and seizure in the sequence of events.  *Id.* at 561 ("In analyzing suppression claims, we consider whether there was sufficient justification at the time of each particular Fourth Amendment intrusion.").  There were four potentially relevant intrusions here, though Greenfield directly challenges only two of them.

The first intrusion came when officers seized Greenfield and told him that he was being stopped (as the officers' actions likewise made clear).  While Greenfield challenged that initial stop in the trial court, on appeal he concedes that it was supported by reasonable articulable suspicion, so that it was compliant with the Fourth Amendment.  *See generally Terry v. Ohio*, 392 U.S. 1 (1968).  The second intrusion came when officers repeatedly asked to look into Greenfield's bag—

suggesting they thought he might have a gun on him—and he responded by producing two bottles of alcohol from the bag. Greenfield disputes the legality of that first bag search, arguing that he did not voluntarily consent to it given the coercive stop and questioning. The third intrusion came when officers, after seeing the open containers of alcohol in Greenfield's bag and noting the intensified smell of PCP, began placing him under arrest. Greenfield does not seem to contest there was probable cause for that arrest given the open container of alcohol he had just revealed, only that it was tainted by the unlawful bag search that preceded it. The fourth intrusion came when Moore contemporaneously conducted a second and more probing search of Greenfield's bag incident to his arrest, uncovering the vials of PCP inside the small zippered container. Greenfield contends that search exceeded the scope of a permissible search incident to arrest because he was already "secured" and separated from his bag.

The government counters that (1) police had probable cause to arrest Greenfield for both POCA and possession of PCP, and to search him incident to that arrest, prior to either search of his bag; and (2) the search of Greenfield's bag did not exceed the permissible scope of a search incident to his arrest. We address the government's arguments in turn.

*1. Officers had probable cause to arrest Greenfield before either search,
and were permitted to search him incident to that arrest.*

We begin with the government's argument that police had probable cause to arrest Greenfield prior to either of the two bag searches, so that those searches were justified as incident to his arrest. If the government is right about that it would moot out Greenfield's argument that he did not voluntarily consent to the initial search of his bag—and his further arguments that the initial unlawful search tainted the later one—because that initial search would be lawful regardless of his consent.

"A search conducted without a warrant is per se unreasonable under the Fourth Amendment unless it falls within a few specific and well-established exceptions." *Ellison v. United States*, 238 A.3d 944, 949 (D.C. 2020) (quoting *United States v. Taylor*, 49 A.3d 818, 821 (D.C. 2012)). One of the most commonly invoked exceptions to the warrant requirement is that police may conduct a warrantless search of a person "incident to a lawful [custodial] arrest." *Id.* (quoting *Taylor*, 49 A.3d at 821). For this exception to apply, an officer (1) must have probable cause to believe the suspect has committed a misdemeanor in their presence, or a felony even if outside the officer's presence, *see Enders v. District of Columbia*, 4 A.3d 457, 461-63 (D.C. 2010) (explaining permitted bases for warrantless arrests), and (2) the search must be roughly contemporaneous with the arrest, though it can precede the formal arrest (and even the decision to arrest), so long as they're very

close in time, *see United States v. Lewis*, 147 A.3d 236, 240 (D.C. 2016) (en banc) ("[W]here the formal arrest follows quickly on the heels of the challenged search of a suspect's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa." (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980))); *id.* at 245 (rejecting argument that a decision to arrest must precede a search incident to arrest).

The government argues that officers had probable cause to arrest Greenfield and were justified in searching him incident to that arrest on two distinct bases prior to either bag search: (1) they had probable cause to arrest him for POCA in light of his admission that he "was drinking a beer" as police arrived on the scene, and (2) they had probable cause to arrest him for possession of PCP, given the reports of PCP use and sales in that park after dark, Greenfield's quick retreat from approaching officers, and the smell of PCP which intensified as officers neared Greenfield. We agree with the government on the first point and do not address the second.[1]

---

[1] It is not entirely clear from the government's brief whether it was arguing that officers had probable cause to arrest Greenfield for POCA prior to him revealing alcohol in his bag, or only afterward. The government clarified at oral argument that its position is that it had probable cause to arrest Greenfield for POCA even prior to him revealing the alcohol in his bag, and we do not detect any procedural unfairness in considering that purely legal argument that the government likewise made before the trial court.

Probable cause to arrest exists when "a reasonable police officer 'considering the total circumstances confronting him and drawing from his experience would be warranted in the belief that an offense has been or is being committed.'" *Ellison*, 238 A.3d at 950 (quoting *Peterkin v. United States*, 281 A.2d 567, 568 (D.C. 1971)). While "[p]robable cause cannot be based on a 'hunch' or 'gut' feeling," *In re T.H.*, 898 A.2d 908, 912 (D.C. 2006) (quoting *(Marvin) Brown v. United States*, 590 A.2d 1008, 1014 (D.C. 1991)), it "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands," *Enders*, 4 A.3d at 471 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975)).

Here, police had probable cause to arrest Greenfield for POCA prior to the initial search of his bag based on Greenfield's apparent admission that he was drinking alcohol in the park when officers arrived. Recall that when officers caught up to Greenfield and asked him why he began walking away as they approached, he quickly volunteered that it was because he "was drinking a beer." That appeared to be a direct admission that Greenfield was drinking an alcoholic beverage in that park, in contravention of D.C. Code § 25-1001(a)(1) ("[N]o person in the District shall drink an alcoholic beverage or possess in an open container an alcoholic beverage in . . . [a] street, alley, park, sidewalk, or parking area."), and that he was doing so in the officers' presence as they arrived at the park—a relevant consideration because POCA is a misdemeanor offense. That is admittedly not the only

conceivable interpretation of Greenfield's statement; perhaps he was volunteering that he had a beer earlier in the evening in a place where it would have been lawful to do so and outside of the officers' presence. But any such innocuous gloss on his statement would require a serious stretch of the imagination.

By far the most natural interpretation of Greenfield's statement is that he had just been drinking alcohol in the park as he saw officers approaching, because only that would supply a ready explanation for his decision to leave the area as officers approached. And in any event, while we think Greenfield's admission standing alone provided evidence that he was probably drinking alcohol in the park upon the officers' arrival—even putting aside that his companions likewise seemed to be drinking alcohol—the probable cause standard does not require a showing that Greenfield was more likely than not committing a POCA offense. *See Ball v. United States*, 803 A.2d 971, 974 (D.C. 2002) ("'Probable cause is a flexible, common-sense standard' that 'does not demand any showing that the officer's belief that he has witnessed criminal behavior be correct or more likely true than false.'" (quoting *Coles v. United States*, 682 A.2d 167, 168 (D.C. 1996))); *Jenkins v. District of Columbia*, 223 A.3d 884, 896 n.14 (D.C. 2020) (police are "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest" (quoting *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001))). That admission was sufficient to supply probable cause to arrest Greenfield for POCA.

Greenfield counters that even if officers had probable cause to arrest him, they lacked probable cause to search his bag a second time after he revealed the alcohol within it. This argument is doctrinally misguided. If the officers had probable cause to arrest Greenfield and were in fact arresting him, that was a sufficient basis to search him incident to arrest, with or without probable cause to search. *See Ellison*, 238 A.3d at 950 ("[A]side from an arrest supported by probable cause, 'a search incident to the arrest requires no additional justification.'" (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973))). On the flipside, if officers did not have probable cause to arrest him, mere probable cause to search could not by itself supplant the warrant requirement—that is merely the predicate for procuring a judicial search warrant, not a substitute for it. *Id.* at 949-50 (citations omitted).

Because we conclude that officers could permissibly search Greenfield incident to his arrest for POCA, their initial search of his bag as it remained in his exclusive possession was lawful regardless of whether he voluntarily consented to that search. Greenfield raises a distinct challenge as to the second search of the bag, which we now address.

### 2. Police did not exceed the permissible scope of a search incident to arrest.

Greenfield's more interesting Fourth Amendment challenge is to the second bag search, which he argues exceeded the permissible scope of a search incident to

his arrest. He asks us to extend the Supreme Court's reasoning in *Arizona v. Gant* beyond the particular context of vehicle searches involved in that case. 556 U.S. 332 (2009). We offer some doctrinal background and explain the rough contours of this argument before addressing its merits and application here.

Whether officers can search an object or area incident to a suspect's arrest generally depends upon whether it is within the suspect's "immediate control" at the arrest's inception. *See Chimel v. California*, 395 U.S. 752, 763 (1969). That means officers can search things within the suspect's reach or lunge when the arrest begins, i.e., "the area from within which he might gain possession of a weapon or destructible evidence." *Id.* There are some caveats to the rule. For instance, as we have discussed above, the search must be roughly contemporaneous with the arrest. If officers unduly delay their search—say the suspect is already down at the station when officers decide to search a bedroom nightstand he was standing next to when arrested—this exception will no longer obviate the warrant requirement. *See (Marcus) Young v. United States*, 982 A.2d 672, 680 (D.C. 2009) (even where object is within arrestee's immediate control, court must "consider whether the events occurring after the arrest but before the search made the search unreasonable" (quoting *(Mark) Young v. United States*, 670 A.2d 903, 907 (D.C. 1996))). That is because the search incident to arrest exception is justified by the "inherent necessities of the [arrest] situation," and must be closely tethered to the two purposes

that justify it, namely, (1) "to remove any weapons that the [arrestee] might seek to use in order to resist arrest or effect his escape" and (2) to "seize any evidence on [or around] the arrestee's person in order to prevent its concealment or destruction." *Chimel*, 395 U.S. at 759, 763 (quoting *Trupiano v. United States*, 334 U.S. 699, 708 (1948)).

Greenfield now argues that the second search of his bag was not permissible incident to his arrest because he had been secured by officers and the bag was in Moore's exclusive control at that time.[2] In short, he maintains that at that point, any further search of his bag became unreasonable under the Fourth Amendment. *See generally (Marcus) Young*, 982 A.2d at 680. While we have previously rejected the argument that the handcuffing of a suspect precludes the search incident to arrest of objects that were in his possession at the arrest's inception, *id.*, Greenfield argues that conclusion is at odds with *Arizona v. Gant*. In *Gant*, the Supreme Court revised how the search incident to arrest exception applies in the context of vehicular searches. 556 U.S. at 335. *Gant* held, contrary to prior precedent, that once a suspect

---

[2] Greenfield makes this particular argument for the first time on appeal, but the government does not argue that he has waived or forfeited it, so we consider its merits and disregard any potential forfeiture. *See Smith v. United States*, 283 A.3d 88, 98 (D.C. 2022) (explaining that we have discretion to entertain forfeiture and waiver arguments not pressed on appeal).

is removed from a vehicle and secured (typically handcuffed), a free-ranging *Chimel* search of the vehicle can no longer be justified.[3]

Greenfield asks us to join a handful of federal circuit courts of appeals that have held that *Gant*'s rationale extends beyond the vehicular search context, so that whenever a suspect is secured away from a container prior to a search, a search incident to arrest of that container will no longer be justified. *See, e.g.*, *United States v. Davis*, 997 F.3d 191, 193 (4th Cir. 2021) ("We join several sister circuits in answering" that "*Gant* applies beyond the automobile context to the search of a backpack."); *United States v. Knapp*, 917 F.3d 1161, 1168 (10th Cir. 2019) ("[A]lthough *Gant* specifically addressed the search of an automobile, its principles apply more broadly," specifically to bar the search of a purse removed from a suspect who had been handcuffed.); *United States v. Cook*, 808 F.3d 1195, 1199 n.1 (9th Cir. 2015) ("We do not read *Gant*'s holding as limited only to automobile searches because the Court tethered its rationale to the concerns articulated in *Chimel*.");

---

[3] *Gant* further held that "circumstances unique to the vehicle context" may nonetheless support a search incident to arrest, even where the suspect is secured away from the vehicle and independent of *Chimel*'s rationales, "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Gant*, 556 U.S. at 343 (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in judgment)). This part of *Gant*'s analysis is irrelevant here, where this particular allowance is unique to the vehicle context, and the government does not suggest that we may extend it outside of that context (though it argues that *Gant* should not extend in any respect outside of the vehicle context).

*United States v. Shakir*, 616 F.3d 315, 318-19 (3rd Cir. 2010) (rejecting government's argument that "*Gant* applies only to vehicle searches" but upholding bag search that occurred after suspect was handcuffed because suspect "was in a public place with some 20 people around, and his bag was right next to him").

Notably, there is at least one federal court of appeals, and several state high courts, that have reached the opposite conclusion post-*Gant*. *See, e.g.*, *United States v. Perez*, 89 F.4th 247, 248-49 (1st Cir. 2023) (upholding search of backpack as properly incident to arrest after suspect was handcuffed and no longer within reaching distance of it), *petition for cert. filed* (Nov. 25, 2024) (No. 24-577); *People v. Marshall*, 289 P.3d 27, 28-29 (Colo. 2012) (en banc) (search of defendant's backpack after he was handcuffed in back of police car remained permissible after *Gant*); *State v. Byrd*, 310 P.3d 793, 794-95 (Wash. 2013) (en banc) (same, only a purse). This court has not yet entered this fray to opine on the issue, which remains an open question in this jurisdiction.[4]

---

[4] This court's opinion in *(Marcus) Young*, permitting an incident search of the bed where the suspect was found even after he had been handcuffed and moved outside, came several months after the Supreme Court decided *Gant*. But our decision in *Young* did not consider any potential impact that *Gant* had on the relevant legal analysis—the briefing preceded *Gant* and the case was not mentioned at all in our analysis—so it does not foreclose Greenfield's argument. We remain free to join the various courts that have adopted his view after *Gant*.

We ultimately do not pick a side in this debate because, in any event, Greenfield was neither secured nor removed from his backpack in any meaningful sense at the time of the second bag search. *Gant*, 556 U.S at 343 (*Chimel*'s rationale applies when suspect is "unsecured and within reaching distance of the" item). When Moore took the bag away from Greenfield, he placed it immediately on the ground by Greenfield's feet and began his roughly fifteen-second search into it, just a foot or two in front of Greenfield, and still clearly within his reach. While two other officers then began to manually restrain Greenfield as the search began, it is evident from the body-worn camera footage that Greenfield was not yet in handcuffs at the time Moore opened the bag's side pocket, removed the small case from it, unzipped it, and peered inside of it with a flashlight. The two officers handling Greenfield can be heard telling him to "stop flexing," "stop," and to "put [his] hands behind [his] back" because they didn't "want to take [him] to the ground" even after Moore had removed the small case and peered inside. As Moore declares that he spotted PCP in the small case, only then do the handcuffs audibly click into place, with a second audible clicking into place about ten seconds later.[5]

---

[5] Were we to adopt Greenfield's position, we doubt officers would have to instantly cease an in-progress search the second handcuffs click onto a nearby suspect. While we need not and do not decide that issue in this case, Fourth Amendment jurisprudence usually provides some reasonable leeway for officers rather than requiring robot-like decisionmaking and cat-like reflexes. *See generally Kentucky v. King*, 563 U.S. 452, 466 (2011) ("The calculus of reasonableness must

In sum, even assuming that *Gant*'s rationale extends to this non-vehicular search, this search was still a proper search incident to arrest. Greenfield remained within arm's reach of the backpack and its contents as the search took place, and he had not yet been meaningfully secured, so that he remained potentially able to grab a weapon or destroy evidence that was inside of the bag up until the time Moore discovered the PCP.

Greenfield's final argument challenging the scope of this search is that, even assuming officers could search his bag, they were not permitted to search the small zippered case within it because there was no reason to believe it would contain evidence of the POCA offense or that it would contain any weapons. This argument is again doctrinally misguided. Police officers are free to search the areas within an arrestee's immediate control without any particularized reason to think they contain evidence of the offense of arrest or a weapon. *See Robinson*, 414 U.S. at 235. To illustrate the point, the Supreme Court's opinion in *Robinson* concerned a search incident to arrest of a suspect arrested for driving on a suspended license. *Id.* at 220. The court upheld the search of a pack of cigarettes found on the suspect—which

---

embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989))); *Lewis*, 147 A.3d at 240 ("courts are reluctant to micromanage" police in conducting arrests and searches incident thereto).

revealed capsules of heroin—despite there being no apparent reason to think it would contain evidence of driving on a suspended license or stood any likelihood of concealing a weapon. *Id.* at 236. The court explained that it was "of no moment" that the officer had no particular reason to think the suspect was armed—and clearly could not expect to find evidence of driving on a suspended license within the cigarette pack—"[s]ince it is the fact of custodial arrest which gives rise to the authority to search." *Id.* "Having in the course of a lawful search come upon the crumpled package of cigarettes, [the officer] was entitled to inspect it." *Id.* The same is true here as to the small zippered case.

**B. There was sufficient evidence that Greenfield knew he had PCP.**

Greenfield also argues that the evidence was insufficient as a matter of law to show he intended to possess PCP. We disagree.

In considering a challenge to the sufficiency of the evidence, we "view the evidence in the light most favorable to the government." *Newman v. United States*, 49 A.3d 321, 324 (D.C. 2012) (quoting *Mihas v. United States*, 618 A.2d 197, 200 (D.C. 1992)). Although the evidence must "*permit* a reasonable fact-finder to find guilt beyond a reasonable doubt[,] it need not compel such a determination." *Id.* (quoting *Taylor v. United States*, 601 A.2d 1060, 1062 (D.C. 1991)). Thus, to prevail on his challenge, Greenfield "must establish that the government presented no

evidence upon which a reasonable mind could find guilt beyond a reasonable doubt." *Id.* (quoting *Mihas*, 618 A.2d at 200). While our review of sufficiency claims is not "toothless," *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc), we recognize that "[i]t is within the province of the fact finder to draw reasonable inferences from the evidence presented," *(Chavez) Smith v. United States*, 837 A.2d 87, 93 n.3 (D.C. 2003), so long as they do not "cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation," *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987).

To prove attempted possession of a controlled substance, "the government must prove that the defendant intended to possess an unlawful substance, but it need not prove (as it must in order to obtain a conviction for possession) that the substance involved was actually unlawful." *(Edwin) Smith v. United States*, 966 A.2d 367, 391 (D.C. 2009). Greenfield does not dispute that the evidence was sufficient to prove that he knew he was in possession of the three vials found in the small case inside of the backpack he carried with him. *See generally United States v. Skidmore*, 894 F.2d 925, 928 (7th Cir. 1990) ("People are presumed to know the contents of their belongings."). He instead argues that the evidence does not support a conclusion that he believed those vials contained PCP.

Contrary to that argument, the evidence was sufficient to support the conclusion, beyond a reasonable doubt, that Greenfield believed he was in possession of PCP. Brown and Moore testified that the three glass vials recovered from Greenfield's bag carried the "distinct," "unique," "pungent," "very, very strong" "chemical" and "[un]pleasant]" odor of PCP. In addition, Brown provided expert testimony that the vials recovered from Greenfield resembled how PCP is typically packaged for street sales in the District: a glass vial containing a yellow or amber liquid.[6] There was also evidence that Greenfield was in a park known for PCP sales and use. Taking that evidence together, there is not any ready explanation—and Greenfield did not offer any explanation at all—as to how he could come into possession of such an obviously noxious substance and fail to promptly rid himself of its pungent smell unless he believed it was PCP and wanted to possess it. There are not any innocuous substances we can think of that look, smell, and are packaged like PCP, as the credited evidence established these vials distinctly did.

Greenfield offers two principal counterpoints. He first argues that the trial court placed undue weight on his evasion of police officers when convicting him of this possessory offense, particularly given the other ready explanations for why he

---

[6] While Moore testified otherwise, the trial court was free to credit Brown—the qualified expert—on the topic.

would want to avoid officers (namely, to avoid detection of his POCA offense). We are content to cede this point to him, at least for the sake of argument, because when there are obvious other explanations for a suspect's flight, the probative value of flight as consciousness of guilt for a particular offense "largely, if not completely, disappears." *Headspeth v. United States*, 86 A.3d 559, 564 (D.C. 2014) (quoting *Williams v. United States*, 52 A.3d 25, 41 (D.C. 2012)). But even when we discount his evasion entirely, it does not affect our conclusion above—we have simply put no reliance on his evasion in our assessment of the sufficiency claim.

Greenfield's second counter is that there was no evidence that he was *aware* of PCP's smell and packaging, a topic the government presented expert testimony to elucidate, so that its mere pungent aroma and packaging could not supply a fair inference that he knew what it was. We again disagree. It is probably true that the average person cannot identify PCP by smell and packaging. But it is even more obviously true that the average person tends not to come into accidental and unknowing possession of several vials of apparent PCP, so that people who do virtually always know what they have, and any rare accidental possessors would naturally seek to quickly rid themselves of it.[7] To draw an analogy, consider bat

---

[7] For this same reason, we reject Greenfield's argument that the government should have been "judicially estopped" from arguing that Greenfield could recognize the smell of PCP by virtue of the government's presentation of expert evidence on the topic. Judicial estoppel is an equitable doctrine that sometimes applies to prevent

feces or "guano." Like PCP, it is malodorous, somewhat scarce, and fairly valuable, owing to distinct properties that make it an excellent fertilizer. Few people are familiar with what guano smells like and how it is typically packaged. But when somebody has it, or a substance that smells and is packaged distinctly like it, you can bet that they intend to possess guano. There is simply no ready explanation for how one might accidentally come into its possession, or why they would not rid themselves of it if they did not know what it was.

The confluence of events that Greenfield posits—that perhaps he came into possession of this PCP by accident, without knowing what it was, and while taking no steps to get rid of it—is not the type of inventive scenario that all rational factfinders would invariably harbor doubts about (even if some might). *See generally Lesher v. United States*, 149 A.3d 519, 525 (D.C. 2016) (upholding attempted possession of marijuana conviction largely because the substance

---

parties from taking "clearly inconsistent" positions over the course of litigation. *See generally New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (discussing judicial estoppel). In Greenfield's view, the government's presentation of expert evidence on how PCP smells and is packaged committed it to the view that those topics are beyond a layperson's knowledge, so that it should not be permitted to argue that Greenfield knew that the smell and packaging was indicative of PCP. Contrary to Greenfield's argument, those positions are not inconsistent, but are quite easy to reconcile. It can both be true that most people don't know what PCP smells like—so that an expert opinion on the matter would be helpful to a typical factfinder—and that most people in possession of PCP know exactly what it smells like and how it is packaged.

"smelled like and was packaged like marijuana"); *Newman*, 49 A.3d at 324, 326 (finding that the "characteristics" of the substance, including its "appearance, smell, and packaging," indicated that the defendant believed the substance was marijuana).

The evidence was sufficient to support this conviction.

### C. The trial court did not err in admitting the glass vials.

Greenfield's final argument is that the three glass vials recovered from his bag were improperly admitted as part of a rebuttal case that the government should not have been afforded because the defense presented no case of its own. The government counters that this is a semantic complaint, because even if the government technically should not have been afforded a rebuttal case, the trial court had discretion to permit the government to reopen its case in order to admit the vials, which is effectively all it did. We agree with the government that (1) the trial court acted within its discretion in permitting the government to admit the vials after it initially rested its case, and (2) that its misnomer of that reopening of the government's case as a "rebuttal" is of no consequence.

A trial court's decision to allow a party to reopen its case "will be reversed only for an abuse of discretion." *Shelton v. United States*, 983 A.2d 979, 985 (D.C. 2009). To determine whether a court has abused its discretion in permitting a party

to reopen its case to admit new evidence, we consider "(1) the timeliness of the motion, (2) the nature of the evidence, including its relevance, and (3) prejudice to the opposing party." *Id.* at 987 (quoting *Davis v. United States*, 735 A.2d 467, 472 (D.C. 1999)). Each of those factors supports the trial court's ruling here: (1) the government moved to admit the vials shortly after it initially closed its case, and there was no evidence taken in the interim; (2) the evidence was undoubtedly relevant; (3) Greenfield cannot identify any prejudice to him, nor can we discern any, by permitting these vials' admission—they had already been presented in court and discussed by both witnesses, so their formal admission was hardly a surprise.

We have upheld a trial court's discretion to reopen the government's case on similar facts even *after* the jury had begun deliberations. *See Austin v. United States*, 292 A.3d 763, 778 (D.C. 2023). *Austin* concerned some audio recordings that were played in open court but, apparently through oversight, were never formally admitted prior to the jury retiring for deliberations. *Id.* When the government sought to formally admit the recordings mid-deliberations, the trial court permitted them to do so, and we explained that was within the court's discretion. *Id.* The only meaningful difference between *Austin* and this case is that the trial in *Austin* had progressed further than it had here, a difference that could only cut in favor of upholding the ruling now on appeal. Like in *Austin*, we conclude that trial courts should liberally accommodate parties' attempts to correct ministerial oversights in

the formal admission of evidence that was before the factfinder, but never formally admitted, absent some compelling reason to do otherwise. And there was no compelling reason to do otherwise here, so the trial court acted within its discretion, and any error in referring to this as a "rebuttal" case was of no consequence.

### III. Conclusion

We affirm Greenfield's convictions.

*So ordered.*